-IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN LEON | : | |
| 801 Cliff Rd. | : | |
| Bensalem, PA 19020 | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No.: |
| | : | |
| BENSALEM TOWNSHIP | : | |
| SCHOOL DISTRICT | : | |
| 3000 Donallen Dr. | : | **JURY TRIAL DEMANDED** |
| Bensalem, PA 19020 | : | |
| | : | |
| Defendant. | : | |
| | : | |

## CIVIL ACTION COMPLAINT

Plaintiff, Kathleen Leon (hereinafter referred to as "Plaintiff"), by and through her undersigned counsel, hereby avers as follows:

### I.   Introduction

1.     Plaintiff has initiated this action to redress violations by the Bensalem Township School District (hereinafter "Defendant") of Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 200d *et seq.*), the Americans with Disabilities Act, as amended, the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601 *et. seq.*), and the Pennsylvania Human Relations Act ("PHRA"). Plaintiff was subjected to an unlawful hostile work environment and constructively terminated by Defendant, and she suffered damages more fully described/sought herein.

### II.   Jurisdiction and Venue

2.     This Court may properly maintain jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of

jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in <u>International Shoe Co v. State of Washington</u>, 326 U.S. 310 (1945) and its progeny.

3.     This action is initiated pursuant to a federal law.  The United States District Court for the Eastern District of Pennsylvania has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States.

4.     Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because Defendant resides in and/or conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

### III.     Parties

5.     The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

6.     Plaintiff is an adult who resides at the above-captioned address.

7.     Defendant is an educational institution in Bensalem Township, Pennsylvania.

8.     At all times relevant herein, Defendant acted through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

### IV.     Factual Background

9.     The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

10.     Plaintiff was hired by Defendant in or about 1998 and had a very successful career until the last approximate 1-2 years of her employment.

11.     Prior to May of 2021, Plaintiff had [1] been promoted several times over the course of her 24+ years with Defendant (including several administrative promotions); [2] received several accolades; and [3] received all proficient and distinguished ratings.

12.     By way of background, Defendant's School Board approached Plaintiff in early 2015, and asked her to serve as Assistant to the Superintendent.

13.     Defendant's School Board also requested that Plaintiff help transition the position of Superintendent from the outgoing Superintendent, Dr. David Baugh, to the new Superintendent (which was still vacant at the time).

14.     Dr. Samuel Lee (hereinafter "Lee") was eventually selected for the position of Superintendent of Defendant; however, while waiting for his arrival, Plaintiff was appointed Acting Superintendent of Defendant.

15.     After Lee was appointed Superintendent of Defendant, Plaintiff held the title of Assistant to the Superintendent until in or about June of 2021.

16.     While employed as Assistant to the Superintendent, Plaintiff also served as a member of the Superintendent's Cabinet and oversaw the Administration for grades K-12 within Defendant, which included but was not limited to directly supervising Jason Bowman ("Mr. Bowman") – former Director of Secondary Curriculum, Instruction & Assessment and indirectly supervising all Principals and Assistant Principals within Defendant.

17.     In addition to her role as Assistant to the Superintendent, Plaintiff also served in other capacities, including but not limited to:

       a.   Defendant's Title IX Coordinator and "First Decision Maker;"[1]

---

[1] As "First Decision Maker", Plaintiff was charged with interviewing witnesses involved in any Title IX complaint along with the Director of Human Resources.

    b.   District Chairperson on Cabinet Interview Committees (per Defendant's policy 303 – Employment of Administrators).

    c.   Internal Chairperson of the Instructional School Board meetings; and

    d.   Pandemic Coordinator of the District.

18.    Despite her hard-work, dedication, accolades, and achievements, Plaintiff's work experience became tainted during the last few years of her employment by the constant discrimination and illegal retaliation that she was subjected to by various high-level members of Defendant (and other employees) – discussed further *infra*.

**<u>Plaintiff Was Subjected to Discriminatory Treatment Based on Her Gender by Defendant's Administration and Other Employees</u>**

19.    Shortly after becoming the Assistant to the Superintendent, Plaintiff began to see clear gender discrimination and disparate treatment directed towards Defendant's female administrators/employees by both Lee and other males within Defendant.

20.    Unfortunately, Plaintiff was also a victim of the aforesaid gender discrimination, as she had been subjected to constant hostility and animosity because of her gender by Lee and the former Principal of Bensalem High School, William Ferrara (hereinafter "Ferrara"), who was Plaintiff's subordinate.

21.    Plaintiff's observations and personal experiences of gender discrimination included but were certainly not limited to the following:

    (1) Various male administrators (principals and directors) were appointed to their positions with no formal interview process, whereas at least two female Assistant Principals at Defendant's middle schools had rigorous multi-round interviews before they joined Defendant.

    (2) Various male administrators (principals and directors) were given preferential

treatment by Lee as it pertained to schedules and enforcement of Defendant's protocols, mandates and directives.

(3) Unlike male administrators, Lee treated Plaintiff in a rude and condescending manner, often raised his voice at Plaintiff, and showed aggressive behavior towards her.

(4) Unlike male administrators, Plaintiff's opinions were often ignored, and Lee consistently failed to support Plaintiff in her role.

(5) Over the last few years of Plaintiff's employment with Defendant, Lee slowly began to marginalize her role and supervision within Defendant.

(6) Like other female administrators, Plaintiff was treated in a condescending and disrespectful manner by Ferrara. Notably, Plaintiff was not the only female between 2020 and 2022 to verbally and/or formally complain about Ferrara's discriminatory behavior towards women.

(7) Plaintiff observed Ferrara refuse to take direction or guidance from females, including her. While Plaintiff served as Ferrara's supervisor until June of 2021, it was very clear that he did not like or want to be supervised by a female.

(8) Ferrara refused to follow the proper chain of command by consistently failing to report important items directly to Plaintiff and instead choosing only to speak to Lee.

(9) Ferrara refused to carbon copy Plaintiff on emails sent to Lee, specifically regarding things that Plaintiff should have been made aware of as the Assistant to the Superintendent.

(10)    All-important incidents which would normally be reported to Lee were required to be reported to Plaintiff in Lee's absence. On several different occasions, Ferrara failed to report important incidents to Plaintiff in Dr. Lee's absence and Plaintiff only learned about these incidents from a third party.

(11)    On at least one occasion, Ferrara instructed Defendant's Supervisor of Pupil Services not to carbon copy Plaintiff on emails, even though she had always done so and was supposed to do so.

(12)    Ferrara never showed any respect to Plaintiff as his supervisor and often refused to follow Plaintiff's directives, mandates or instructions and was downright insubordinate to her. While Plaintiff had given Ferrara written warnings for his aforesaid conduct, his behavior never improved.

(13)    Plaintiff reported Ferrara's aforesaid discriminatory and insubordinate behavior to Lee on numerous occasions and was present when other Cabinet members complained of Ferrara's poor performance and incompetency as a principal. Despite all of this, Lee refused to take any remedial action, allowed Ferrara's disrespectful behavior and poor performance to continue, and retaliated against Plaintiff for her complaints.

(14)    A direct report of Ferrara, Dr. Diana Garaitonandia (former Assistant Principal of Bensalem High School – hereinafter "Garaitonandia"), filed a Title IX gender discrimination complaint against him in 2021.  As part of this complaint, Plaintiff's name was presented as "another female" who Ferrara did not respect.

22.    The discriminatory treatment that Plaintiff received from Ferrara and other male

administrators was so severe and blatantly obvious that other employees of Defendant witnessed it as well.

23.     More specifically, Garaitonandia witnessed the following acts of discrimination and disparate treatment exhibited by Ferrara towards Plaintiff (which is not intended to be an exhaustive list):

      a.   Whenever Ferrara would get a directive from Plaintiff or when she would instruct him not to do something, he would be observed becoming extremely angry, to the point that he would kick the walls, curse and aggressively pace around the building.

      b.   During (and outside of) the aforesaid instances of anger and aggression (after receiving directive or instructions from Plaintiff), Ferrara was observed making negative and derogatory comments about Plaintiff.

      c.   Garaitonandia never witnessed him act in the same manner (as described *supra*) when male administrators gave him directive, instructions, or correction.

      d.   Ferrara would give orders to his direct reports (including Garaitonandia) not to follow Plaintiff's instructions, directions, or requests.

24.     Another male administrator was also observed by Garaitonandia making derogatory comments about Plaintiff, including calling Plaintiff a c*nt.

25.     The foregoing acts of discrimination listed above are not all inclusive, but rather just a list of examples.

26.     These aforesaid acts of discrimination by Ferrara continued up and through June of 2021, when Plaintiff stopped supervising him – discussed *infra*, and sometimes even after.

27.     The aforesaid acts of discrimination by Lee continued up and through the time of Plaintiff's constructive discharge – discussed further *infra*.

28.     As a result of constant discrimination, bullying, and harassment that she was subjected to by Lee and Ferrara, Plaintiff started visiting her doctor for chest pains, dizziness, frequent nausea, fatigue, and anxiety.

29.     At one point, on January 7, 2020, Plaintiff was required to take a medical leave of absence under the FMLA for high blood pressure, chest pain, anxiety, increased migraines, gastritis, and occupational related stress.

30.     On the day that Plaintiff commenced her medical leave of absence, she spoke with Ms. Felicity Hanks, Esq. (hereinafter "Hanks"), former Director of Human Resources, about her health.

31.     During her aforesaid conversation with Hanks, Plaintiff was very upset about a conversation that occurred earlier with Lee. Plaintiff proceeded to tell Hanks that she felt marginalized, targeted, and retaliated against because of her complaints regarding Ferrara.

32.     Plaintiff further informed Hanks during their aforesaid conversation that Lee was allowing such egregious behavior to exist and that as a result of the constant discriminatory/retaliatory treatment (discussed *supra*), her health had been negatively impacted to the point that she needed to start seeing a doctor.

33.     Plaintiff's aforesaid concerns of discrimination and retaliation were never properly investigated or addressed by Hanks.

34.     Plaintiff remained on medical leave for approximately five (5) weeks until on or about February 10, 2020.

35.     After Plaintiff's return from medical leave on or about February 10, 2020, the

discriminatory and retaliatory treatment from Lee and Ferrara (discussed *supra*) continued and in fact, grew worse.

36.     As a result of the ongoing hostile work environment, Plaintiff continued to seek counseling from a therapist in order to navigate the hostile work environment that she was being subjected to.

**Plaintiff Provides Favorable Testimony During a Title IX Gender Discrimination Complaint Filed by Another Employee Against Ferrara and Expresses That She Too Has Been Subjected to Gender Discrimination**

37.     Plaintiff was not the only employee of Defendant that was discriminated against based on gender.

38.     On about April 19, 2021, Plaintiff was requested to join a meeting/interview with Hanks and David Conn, Esquire (hereinafter "Conn") from Sweet, Stevens, Katz & Williams.

39.     Plaintiff was informed by Conn that she was called into this meeting on April 19, 2021 to "testify" as a witness on behalf of Garaitonandia, who had filed a Title IX gender discrimination claim against Ferrara.

40.     Plaintiff was further told by Conn that even though she was the District's Title IX First Decision Maker, her name was listed as "another female" who Ferrara had treated with disrespect and therefore, it would be a conflict of interest for Plaintiff to serve as the First Decision Maker for this particular complaint.

41.     Plaintiff's aforesaid April 19, 2021 interview/meeting lasted approximately 2.5 hours, during which she was asked a series of questions about her observations, beliefs and interactions with Ferrara and Lee.

42.     Plaintiff was assured that she would not be retaliated against for any testimony given during the April 19, 2021 interview/meeting, but that Lee would be notified that she had

testified and what she had testified to.

43.    Plaintiff agreed to provide honest answers to all of Conn's questions during the aforesaid meeting/interview. Some of the information Plaintiff provided to Conn included but was not limited to:

(1) Plaintiff had been made aware that Ferrara often held meetings with the three male Assistant Principals at the high school but left out Garaitonandia.

(2) Plaintiff perceived that a "good old boys' club" existed within Defendant and that the "good old boys' club" consisted of several male administrators, including Lee, Ferrara, Assistant Principal of Bensalem High School and Athletic Director – Geoff Per (hereinafter "Per"), Principal of Robert K. Shafer Middle School – Mike Stock (hereinafter "Stock"), and Bowman.

(3) Plaintiff believed that the aforesaid male administrators received preferential treatment from Lee.

(4) Plaintiff witnessed Ferrara be condescending to females, and not take direction or guidance given by females, including herself.

(5) Plaintiff had been in the presence of Ferrara when he made negative comments about gay people.

(6) It was clear that Ferrara did not like reporting to a female administrator [i.e. Plaintiff] and he often did not follow her directives and mandates.

(7) For the last approximate six (6) years of her employment, Lee permitted Ferrara to be disrespectful to Plaintiff.

(8) Lee was aware and present for multiple occasions when Ferrara was disrespectful to Plaintiff and did nothing to correct his behavior.

(9) Plaintiff had reported Ferrara's discriminatory conduct to Lee on numerous occasions and that while Lee always said the three of them would meet and discuss, it never happened.

(10) Plaintiff was often not treated with respect by Lee (like her male colleagues) and that she had reported Lee's behavior to Hanks previously.

(11) Hanks had personally witnessed Plaintiff being treated in a rude and aggressive manner by Lee.

(12) Plaintiff took FMLA leave on January 7, 2020 because of the hostile work environment she was being subjected to by Lee and Ferrara and was suffering from high blood pressure, chest pain, increasing migraines, gastritis, and occupational stress.

(13) Plaintiff was seeing a therapist to try to cope with the hostile work environment that she was being subjected to.

42. At the end of the interview/meeting with Conn (discussed *supra*), Plaintiff was informed that because she was the Title IX Coordinator, she would be made aware of the outcome of Conn's investigation and that Lee would also be made aware of the findings. Plaintiff, however, never received a report of Conn's findings.

43. Plaintiff was further informed that Conn would have to prepare a written summary of his investigation and would likely be including witness testimony.

**Plaintiff is Subjected to Retaliation by Defendant's Management Following Her Protected Activity in the April 2021**

44. Shortly after giving favorable testimony for a female administrator in connection with her gender discrimination complaint (discussed *supra*) and expressing concerns of gender discrimination exhibited towards her as well, Plaintiff was subjected to retaliatory treatment by

Lee and Hanks.

45.     For example, shortly after providing testimony in favor of Garaitonandia's gender discrimination complaint, while simultaneously complaining of gender discrimination against her as well, Hanks and Lee began to further marginalize Plaintiff's role within Defendant.

46.     For example, for the first time ever, Defendant decided to use Hanks and an outside source to search for a new Director of IT. This typically would have been a search and interview process that Plaintiff was directly involved in, but they excluded her from the same.

47.     In addition to the foregoing, on May 5, 2021, Plaintiff was requested to meet with Lee.

48.     When Plaintiff arrived at the May 5, 2021 meeting with Lee, he began to talk about Plaintiff's performance over the last year, stating "I feel in the past year you have sometimes compromised the mission of the district" and that Plaintiff was not supporting him.

49.     In response to the aforesaid statements about her performance, Plaintiff asked Lee to provide explanations, but his reply was riddled with baseless and ridiculous assertions.

50.     After criticizing her performance and despite never receiving any prior performance warning or negative performance evaluation, Lee informed Plaintiff that he was making Dr. Victoria Velazquez (hereinafter "Velazquez") the Assistant to the Superintendent of K-12 Administration – which is the job that Plaintiff was performing.[2]

51.     When Plaintiff ask Lee what her role would be going forward, he explained that she could keep her title and her salary but that ***she would no longer be overseeing the principals of the District*** and instead she would be overseeing K-12 Curriculum & Instruction.

52.     While Plaintiff had overseen curriculum at the middle school and high school

_____

[2] It is not surprising that Defendant chose a female to take over Plaintiff's job duties and it was clearly a tactical move so that Defendant could not be accused of further gender discrimination.

levels in a prior position, she had never directly overseen curriculum at the elementary level.

53.     Plaintiff stated to Lee multiple times during their May 5, 2021 conversation that his actions were being taken in retaliation for the testimony she provided during her April 19, 2021 meeting/interview with Hanks and Conn and that the only reason Lee wanted to change her job duties (particularly overseeing the principals of Defendant) was because he no longer wanted Ferrara to report to Plaintiff (another example of Lee favoring a male over a female).

54.     While Lee denied Plaintiff's aforesaid allegations, it was clear that Lee's decision to change Plaintiff's job was completely retaliatory.

55.     During the May 5, 2021 meeting between Lee and Plaintiff, Lee further alleged that Velazquez told him that she could not work with Plaintiff because there was tension between them.

56.     Plaintiff never had any problem with Velazquez in the past and in fact, it was not unusual for Plaintiff and Velazquez to previously have breakfast or lunch together or to go to happy hour on occasion. In fact, Velazquez was invited to Plaintiff's daughter's graduation party and wedding shower.[3]

57.     It was obvious that Lee was fabricating lies regarding Velazquez to cause division between Velazquez and Plaintiff in order to make Plaintiff's work environment even more hostile (and presumably to try to get her to quit).

58.     On May 26, 2021, the School Board Agenda approved a new job description for Velazquez as "Assistant to the Superintendent K-12 Administration."

59.     On June 16, 2021, Plaintiff received a new job description and title – "Assistant to the Superintendent Teaching & Learning."

---

[3] Plaintiff's relationship with Velasquez did change after Plaintiff filed an EEOC Charge of Discrimination in June of 2021 (and after she returned from a medical leave of absence in October of 2021) – discussed further *infra*.

60.     Both job descriptions (discussed *supra*) were approved at the Board Action Meeting on June 23, 2021.

61.     Plaintiff's new job description was extremely voluminous and contained 62 bullet pointed "Essential Duties and Responsibilities."

62.     Plaintiff's old job description (and Velazquez's new job description) only contained 32 "Essential Duties and Responsibilities."

63.     In her aforesaid new job description, Plaintiff was essentially tasked with taking over the role of two other Cabinet members who had recently left the Cabinet.

64.     Plaintiff was therefore assigned to perform the work of multiple people without any pay raise or assurance that she would be provided with training and coaching (which Velazquez was given in her new role).

65.     As a result of the clear inequities in her new job description (discussed *supra*), Plaintiff expressed her disagreement with the new job title and description to Lee on June 18, 2021, including how she felt her new role and responsibilities denoted a set-back in her career and severely impacted her future endeavors.

66.     It was clear that Defendant was trying to force Plaintiff to quit and/or set her up for failure with the aforesaid new role.

**Plaintiff Takes Another Medical Leave Due to the Hostile Work Environment She Was Subjected to After Complaining of Gender Discrimination and Providing Favorable Testimony in Connection with a Gender Discrimination Complaint**

67.     On or about June 22, 2021, shortly after receiving her aforementioned new job description and role, Plaintiff began to experience chest pain and went to Urgent Care.

68.     Urgent Care called for Plaintiff to be transported via ambulance to the hospital because of her high blood pressure and abnormal EKG.

69.     Plaintiff stayed at the hospital for two days to undergo testing and then was released; however, her blood pressure remained elevated, and the stress of the hostile work environment began taking its toll on Plaintiff both physically and mentally to the point that Plaintiff's doctor recommended that she take a leave of absence from work – which she commenced on June 23, 2021.

70.     On or about July 7, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission outlining the above information and asserting claims of discrimination and retaliation under the Title VII and the ADA. Plaintiff also mentioned in her EEOC charge that she believed she was retaliated against under the FMLA as well (because of her previous FMLA claim in January of 2020).

71.     On or about Monday, October 11, 2021, Plaintiff returned to work from her aforesaid medical leave.

72.     Defendant had learned of Plaintiff's EEOC Charge of Discrimination before she returned from medical leave in October of 2021.

**Plaintiff Continues to be Subjected to Discrimination and Retaliation Upon her Return from Medical Leave Through Marginalizing and/or Removing Her Job Duties and Supervisory Authority**

73.     After returning from medical leave in October of 2021, Plaintiff continued to be subjected to further discrimination and retaliation.

*A. Plaintiff Was Denied the Ability to Facilitate Weekly Administrative Meetings*

74.     Upon Plaintiff's return from her aforesaid medical leave, she was informed by Lee that she would return to facilitating the weekly Administrative Meeting formerly known as Instructional Cabinet Meetings.

75.     However, at the end of the first weekly Administrative Meeting, Velazquez told

Plaintiff that she [Velazquez] was now facilitating the meetings, not Plaintiff (despite it being part of Plaintiff's new job description given to her in June of 2021).

76.     Between October of 2021 and Plaintiff's constructive discharge, Velazquez rarely (if every) spoke to Plaintiff except during weekly Administrative Meetings.

**B. Defendant's Management Interfered with Plaintiff's Supervision of Three Curriculum & Instruction Supervisors**

77.     In addition to the foregoing, Plaintiff's newly created job description (discussed *supra*) stated that she would oversee three Curriculum & Instruction Supervisors. However, the supervisors that Plaintiff was supposed to oversee were continually reporting to Lee.

78.     Plaintiff expressly told Lee that when the aforesaid Curriculum & Instruction Supervisors report directly to him and when Velazquez gives them assignments without her knowledge, it creates constant stress and tension.

79.     In response to Plaintiff's aforesaid expressed concerns about the Curriculum & Instruction Supervisors, Lee provided no support to Plaintiff and continuously interfered with her ability to perform her job duties.

**C. Defendant's Management Refused to Communicate with Plaintiff Regarding Important Information**

80.     Plaintiff was left in the dark the majority of the time regarding the work that Lee and Velazquez were giving to the supervisors who she was supposed to oversee. The daily "not knowing or being informed" and the lack of communication from Lee and Velazquez was severely hampering Plaintiff's ability to perform her job as outlined in her June, 2021 job description.

81.     Furthermore, Velazquez sent K-12 principals and other administrators emails and copied other Cabinet members, but frequently did not copy Plaintiff.

82. Plaintiff's ability to know what principals were being told and what information was being disseminated to them was important for her job as well. Not knowing this information was again interfering with her ability to perform her new job effectively.

### D. Defendant's Management Intentionally Excluded Plaintiff from Monthly Meetings with the Bensalem Teachers Education Association.

83. For six years, as Assistant to the Superintendent, Plaintiff along with other Cabinet members met with the Bensalem Teachers Education Association ("BTEA") monthly.

84. However, after Plaintiff filed an EEOC charge and returned from medical leave in October of 2021, she was never once extended an invitation to this meeting.

85. Plaintiff personally called George Daka (Teacher/BTEA President – hereinafter "Daka") and asked why she was not being extended an invitation to any of these meetings, especially because there were items on the monthly meeting agendas that fell directly under Plaintiff's supervision as Assistant to the Superintendent Teaching & Learning (her new position).

86. In response to Plaintiff's aforesaid inquiry, Daka stated that he asked Lee several times whether he should invite Plaintiff to the BTEA monthly meetings, but Lee told him "No" (even though Brian Cohen, the Director of Special Services and Velazquez continued to join the monthly meetings).

87. On two occasions, Kathryn Hinshaw, a Curriculum & Instruction supervisor that Plaintiff directly oversaw as part of her new role, joined the monthly BTEA meeting to support curricular concerns on the agenda, yet Plaintiff was never asked to join.

88. Curriculum, Instruction & Assessment fell directly under Plaintiff and her new role as Assistant to the Superintendent Teaching & Learning.

89. While it was usually protocol for the Cabinet member who oversees the area of

concern on the BTEA meeting agenda to be present to listen to the concerns and support next steps, Plaintiff was consistently denied access to these important discussions – which again not only interfered with her ability to do her job effectively, but also minimized her role within Defendant (even more than it had already been at that point).

### E. Plaintiff's Former Role of Chairperson of the Interview Committee was Stripped from Her and She was Denied Access to the Interview Process for Hiring New Principals and Cabinet Members

90.     Defendant had a policy (Policy 303) that sets out the course of how to conduct interviews for hiring new Principals and Cabinet members, which stated that the Assistant to the Superintendent is the chairperson of the committee.

91.     As stated previously, in addition to her role as Assistant to the Superintendent (which she held until June of 2021), Plaintiff assumed the role of District Chairperson on Cabinet Interview Committees (per Respondent's Policy 303 – Employment of Administrators).

92.     Therefore, for six years preceding Plaintiff's EEOC charge and aforesaid medical leave, Plaintiff facilitated the interview committees of Cabinet members, principals, and assistant principals.

93.     As part of the discriminatory and retaliatory hostile work environment that Plaintiff was being subjected to, Defendant's management stripped Plaintiff of her role as District Chairperson on Cabinet Interview Committees and instead, charged Velazquez with facilitating this process.

94.     In fact, Plaintiff was never even invited to participate in the interview committee process (discussed *supra*) nor serve as Chairperson after filing her EEOC charge and returning from medical leave.

95.     Notably, when Plaintiff did facilitate the aforesaid interview process (before filing

her EEOC charge and taking medical leave in June of 2021), she typically invited Velazquez, Bowman, and other Cabinet members.

### F. Plaintiff was Also Removed from Other Roles She Performed in Outside of Her Everyday Position

96.     In addition to being removed from her role as District Chairperson on Cabinet Interview Committees (discussed *supra*), Plaintiff was also removed from her roles as (1) Respondent's Title IX Coordinator and "First Decision Maker;" and (2) Pandemic Coordinator of the District for discriminatory and retaliatory reasons in violation of the ADA, Title VII, and FMLA (discussed *supra*).

97.     Furthermore, while Plaintiff still served as the Internal Chairperson of the Instructional School Board meetings, she lost autonomy with preparing the agenda for such meetings (as she once had before filing her EEOC charge and taking medical leave in June of 2021). Instead, Lee would tell Plaintiff was items to place on the agenda for said meetings.

### G. Plaintiff Was Refused Support After Being Asked to Join the Bucks County Cohort for System Design Benchmarking

98.     On one occasion, Lee asked Plaintiff to join the Bucks County cohort for System Design Benchmarking. Plaintiff agreed to represent Defendant along with Velazquez, two assistant principals and one acting assistant principal.

99.     However, Plaintiff quickly became the only one representing Defendant at the aforesaid cohort, as Velazquez began to no longer attend the sessions and the assistant principals, and the acting assistant principal were not given the ability to attend.

100.     When Plaintiff asked for support from Lee so that she could properly represent the district, none was given.

101.     In addition to the foregoing, Plaintiff was also not provided with the necessary

information to represent Defendant effectively at the cohort.

### H.  Plaintiff was Denied Access to the Curriculum & Instruction Budget

102.    As part of her new role as Assistant to the Superintendent – Teaching & Learning, Plaintiff requested access to the Curriculum & Instruction budget, which was needed to properly perform in her role.

103.    Prior to the change in job title and descriptions (discussed *supra*), Velazquez and Bowman released requisitions, approved orders, and monitored the budget for Curriculum & Instruction.

104.    However, after Plaintiff was charged with overseeing K-12 Teaching & Learning in her new position, she expressed several times to multiple members of Administration, that she should have administrative rights and budget access.

105.    Plaintiff's aforesaid request for permission to the Curriculum & Instruction budget was never granted or reassigned. Instead, Velazquez continued to monitor the budget purchases even though this was Velazquez's ***former responsibility*** when she had oversight of K-6 Curriculum & Instruction.

### I.  Defendant's Management Refused to Consult with Plaintiff on Important Matters that Directly Involved her New Job Position and Responsibilities.

106.    Lee consistently refused to consult or include Plaintiff on important decisions, meetings, and discussions regarding matters that were directly related to her job responsibilities, which (1) made it very difficult for Plaintiff to perform her job effectively; and (2) effectively changed the job description that Plaintiff was given in June of 2021 for her new role (discussed *supra*).

107.    For example, on one occasion, Lee decided to purchase new curriculum materials for K to 12 English Language Arts without consulting Plaintiff in any way (the Assistant to the

Superintendent of K-12 Teaching & Learning).

108.    Lee's aforesaid behavior (discussed in Paragraph 107 of the instant Civil Action Complaint) totally undermined the English Language Arts audit process that was being conducted and also undermined Plaintiff's role within Defendant.

109.    In fact, rather than asking Plaintiff her thoughts and impressions of the new programming materials, which cost more than one million dollars, he instead relied on the word of one of Plaintiff's direct reports, who examined the program materials on her own without a proper audit.

110.    There were several other occasions during the 2021/2022 school year that Plaintiff was excluded from important meetings where information was shared that was necessary to effectively perform her job duties as Assistant to Superintendent – Teaching & Learning.

111.    Plaintiff was also regularly ignored when she asked for direction, clarity, or additional information needed to properly perform in her new role.

**Plaintiff Complains of Discrimination and Retaliation on Several Occasions During the 2021/2022 School Year to No Avail**

112.    As a result of the foregoing discrimination and retaliation that Plaintiff was subjected to following her aforesaid June 2021 medical leave and her EEOC filing (discussed *supra*), Plaintiff attempted to find a resolution by expressing concerns of such unlawful conduct with HR and Administration on several occasions. However, her concerns were never properly investigated or resolved.

113.    For example, shortly after returning from medical leave, Plaintiff requested a meeting with Terry Hintenberger, the Interim Director of Human Resources (hereinafter "Ms. Hintenberger").

114.    Rather than giving Plaintiff a private meeting to express her aforesaid concerns, Hintenberger scheduled a meeting with her, Plaintiff, Lee and Velazquez.

115.    Plaintiff expressed concern over going to this meeting with Hintenberger, Lee, and Velazquez, as it was a clear intimidation tactic; however, after being questioned by Lee about whether she was choosing to be "insubordinate" by not attend the meeting, Plaintiff chose to attend.

116.    During her aforesaid meeting with Lee, Hintenberger, and Velazquez, things only got worse. For example: (1) Lee and Velazquez began to admonish Plaintiff for no reason (and when Velazquez was not even Plaintiff's supervisor); (2) Plaintiff was told that she was "tackey" by Velazquez; (3) Lee made several remarks about how in Plaintiff's absence, things ran very smoothly (so as to imply that Plaintiff was the cause for issues within Defendant); and (4) Plaintiff was treated in a very rude and condescending manner by both Lee and Velazquez.

117.    The aforesaid meeting with Lee, Hintenberger, and Velazquez (which was originally scheduled so that Plaintiff could express her concerns of ongoing discrimination and retaliation) became so hostile that Plaintiff began to break down and cry during and after the meeting.

118.    Plaintiff again tried to meet with Hintenberger after the joint meeting with Lee and Velazquez to discuss her concerns about the negative and hostile treatment she was clearly receiving following her return from medical leave and in response to her EEOC claims, but Hintenberger again ignored Plaintiff's concerns, did not take any notes during their meeting, and was dismissive of anything Plaintiff had to say.

119.    Plaintiff also had discussions with Lee about her concerns of retaliation and Velazquez's hostile/retaliatory behavior.

120.    Lee's behavior never changed following Plaintiff's aforesaid complaints and Lee never spoke to Velazquez about Plaintiff's concerns.

121.    In addition, Lee never provided Plaintiff with support to ensure success between Plaintiff's and Velazquez's positions (even though Defendant claims that it restructured Plaintiff's position and added a second Assistant to the Superintendent (Velazquez) due the fact that an "Equity Audit" saw the need for two Cabinet members to work together in these positions).

122.    Following her complaints about Velazquez's retaliatory and hostile behavior, Plaintiff witnessed Velazquez speaking about her unprofessionally and in a degrading manner with another individual over the phone in her office (loud enough for Plaintiff and others to hear).

123.    After hearing Velazquez's degrading comments (discussed *supra*), Plaintiff sent Lee and Hintenberger an email again expressing her concerns about Velazquez's behavior; however, similar to her prior complaints, Plaintiff concerns were ignored again.

## Plaintiff is Constructively Discharged

124.    Regardless of the fact that Plaintiff still had the words "Assistant to the Superintendent" in her job title, her actual position changed completely in June of 2021, as she no longer had the same job responsibilities, supervisory authority, decision-making authority, autonomy, or oversight as she once had.

125.    Furthermore, the change in her job denoted a set-back in her career, which would negatively impact her future endeavors in education.

126.    After starting her new role as Assistant to the Superintendent – Teaching & Learning, Defendant' management continually interfered with Plaintiff's ability to perform her

job and Plaintiff's job responsibilities continued to be consistently removed and marginalized to the point that her role, responsibilities, authority, and oversight was irrevocably damage, as Plaintiff's direct reports no longer saw her as their supervisor.

127.   Plaintiff's role as Assistant to the Superintendent – Teaching & Learning was drastically different from her former role (as Assistant to the Superintendent) and from what Defendant's management portrayed her new role to be pursuant to the job description provided to her in June of 2021.

128.   In addition to the foregoing, Plaintiff's health continued to be negatively impacted by the ongoing discriminatory and retaliatory treatment from Defendant's management.

129.   Therefore, based on the fact that she was forced into an entirely different role from that of her former role as Assistant to the Superintendent or even from that of the role she was given a job description for in June of 2021 (Assistant to the Superintendent Teaching & Learning) and/or because of the hostile work environment she was subjected to, which was having a profound negative impact on her physical and mental health, Plaintiff was constructively discharged.

130.   On February 11, 2022, Plaintiff was left with no other choice but to submit her intent to retire.

131.   Plaintiff notified Defendant that her last day would be June 30, 2022.

132.   Between February 11, 2022 and May 11, 2022, the hostile work environment did not improve and Lee began to question Plaintiff's time off from work related to her medical conditions.

133.   Plaintiff could neither mentally nor physically be subjected to the aforesaid toxic work environment any longer and therefore used remaining vacation time and sick days from the

Act 93 sick bank (which were granted upon request) to bridge the gap between May 12, 2022 and her ultimate separation date of June 30, 2022.

134.    Plaintiff believes and therefore avers that she was subjected to a discriminatory and retaliatory hostile work environment and constructively discharged in violation of Title VII, the ADA, and FMLA.

**COUNT I**
**Violations of Title VII**
**([1] Gender Discrimination; [2] Retaliation; [3] Hostile Work Environment)**

135.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

136.    Plaintiff was subjected to an ongoing hostile work environment based on her gender while employed with Defendant (discussed *supra*).

137.    Plaintiff was subjected to an ongoing retaliatory hostile work environment based on her complaints of discrimination, complaints of unlawful retaliation, and/or because she offered favorable witness testimony in a Title IX gender discrimination complaint (which was lodged by another employee of Defendant).

138.    Plaintiff complained about the aforesaid discriminatory and retaliatory harassment/hostility that she was subjected to on numerous occasions before ultimately being constructively terminated from her employment.

139.    Plaintiff even filed a Charge of Discrimination with the EEOC outlining concerns of gender discrimination and retaliation in July of 2021.

140.    In response to Plaintiff's complaints of gender discrimination and retaliation, Defendant never properly investigated her claims and instead, she was subjected to increased

hostility and animosity (which contributed to the ongoing discriminatory and retaliatory hostile work environment she was subjected to leading up to her constructive discharge).

141.    Plaintiff  believes and avers that her gender was a motivating and/or determinative factor in Defendant's decisions to (*inter alia*) (1) remove her from her position as Assistant to the Superintendent; (2) place her in a position that denoted a set-back in her career; (3) take away various roles that she previous held; (4) take away job responsibilities in her new role as Assistant to the Superintendent – Teaching & Learning and interfered with her ability to perform in said role; (5) completely marginalize and/or change the role of Assistant to the Superintendent – Teaching & Learning from how it was presented to her in June of 2021; and (6) constructively terminate her employment.

142.    Furthermore, Plaintiff believes and avers that Defendant (1) removed her from her position as Assistant to the Superintendent; (2) placed her in a position that denoted a set-back in her career; (3) took away various roles that she previous held; (4) took away job responsibilities in her new role as Assistant to the Superintendent – Teaching & Learning and interfere with her ability to perform in said role; (5) completely marginalized and/or changed the role of Assistant to the Superintendent – Teaching & Learning from how it was presented to her in June of 2021; and (6) constructively terminated her employment, in retaliation for her complaints of gender discrimination, her complaints of retaliation under Title VII and/or in retaliation for offering favorable testimony as a witness in connection with another employee's gender discrimination complaint.

143.    These actions as aforesaid constitute violations of Title VII.

**COUNT II**
**Violations of the PHRA**
**([1] Gender Discrimination; [2] Retaliation; [3] Hostile Work Environment)**

144.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

145.    Plaintiff was subjected to an ongoing hostile work environment based on her gender while employed with Defendant (discussed *supra*).

146.    Plaintiff was subjected to an ongoing retaliatory hostile work environment based on her complaints of discrimination and/or because she offered favorable witness testimony in a Title IX gender discrimination complaint (which was lodged by another employee of Defendant).

147.    Plaintiff believes and avers that her gender was a motivating and/or determinative factor in Defendant's actions of (1) removing her from her position as Assistant to the Superintendent; and (2) placing her in a position that denoted a set-back in her career.

148.    Plaintiff believes and avers that Defendant (1) removed her from her position as Assistant to the Superintendent; and (2) placed her in a position that denoted a set-back in her career because of her complaints of gender discrimination and/or retaliation and/or in retaliation for being a favorable witness in connection with a gender discrimination complaint lodged by another employee of Defendant.

149.    These aforesaid actions constitute violations of the PHRA.

150.    Plaintiff will move to amend this complaint to included additional acts of discrimination and retaliation once such claims have been administratively exhausted with the PHRC and one year has passed since her second filing and/or she is issued a case closure letter from the PHRC. Such claims will mirror those already set forth in Count I of the instant Civil Action Complaint.

**COUNT III**
**Violations of the Americans with Disabilities Act "ADA"**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3] Hostile Work Environment )**

27

151.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

152.    Plaintiff was subjected to an ongoing hostile work environment because of her (1) actual disabilities; (2) perceived disabilities; (3) record of impairment; and/or (4) protected activity under the ADA.

153.    Plaintiff filed a Charge of Discrimination with the EEOC outlining concerns of disability discrimination and retaliation under the ADA in July of 2021.

154.    In response to Plaintiff's complaints of disability discrimination and retaliation, Defendant's never properly investigated her claims and instead she was subjected to increased hostility and animosity (which contributed to the ongoing discriminatory and retaliatory hostile work environment she was subjected to leading up to her constructive discharge).

155.    Plaintiff  believes and avers that her actual, perceived and/or record of disabilities were a motivating and/or determinative factors in Defendant's decisions to (*inter alia*) (1) remove her from her position as Assistant to the Superintendent; (2) place her in a position that denoted a set-back in her career; (3) take away various roles that she previous held; (4) take away job responsibilities in her new role as Assistant to the Superintendent – Teaching & Learning and interfere with her ability to perform in said role; (5) completely marginalize and/or change the role of Assistant to the Superintendent – Teaching & Learning from how it was presented to her in June of 2021; and (6) constructively terminate her employment.

156.    Plaintiff also believes and therefore avers that Defendant (1) removed her from her position as Assistant to the Superintendent; (2) placed her in a position that denoted a set-back in her career; (3) took away various roles that she previous held; (4) took away job responsibilities in her new role as Assistant to the Superintendent – Teaching & Learning and

interfered with her ability to perform in said role; (5) completely marginalized and/or changed the role of Assistant to the Superintendent – Teaching & Learning from how it was presented to her in June of 2021; and (6) constructively terminated her employment, in retaliation for engaging in protected activity under the ADA.

157.    These aforesaid actions constitute violations of the ADA.

**COUNT IV**
**Violations of the PHRA**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3] Hostile Work Environment)**

158.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

159.    Plaintiff was subjected to an ongoing hostile work environment because of her (1) actual disabilities; (2) perceived disabilities; (3) record of impairment; and/or (4) protected activity under the ADA.

160.    Plaintiff was subjected to an ongoing retaliatory hostile work environment based on her requests for reasonable accommodations.

161.    Plaintiff believes and avers that her actual, perceived, and/or record of disabilities were motivating and/or determinative factors in Defendant's actions of (1) removing her from her position as Assistant to the Superintendent; and (2) placing her in a position that denoted a set-back in her career.

162.    Plaintiff believes and avers that Defendant (1) removed her from her position as Assistant to the Superintendent; and (2) placed her in a position that denoted a set-back in her career because of her requested accommodations (which constitutes illegal retaliation under the PHRA).

163.    These aforesaid actions constitute violations of the PHRA.

164.    Plaintiff will move to amend Count IV to included additional acts of discrimination and retaliation once such claims have been administratively exhausted with the PHRC and one year has passed since her second filing and/or she is issued a case closure letter from the PHRC. Such claims will mirror those already set forth in Count III of the instant Civil Action Complaint.

## COUNT V
## Violations of the Family and Medical Leave Act ("FMLA")
### (Interference & Retaliation)

165.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

166.    Plaintiff was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

167.    Plaintiff requested leave from Defendant, her employer, with whom she had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

168.    Plaintiff had at least 1,250 hours of service with the Defendant during her last full year of employment prior FMLA leave request[s].

169.    Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

170.    Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of FMLA.

171.    Defendant committed interference and retaliation violations of the FMLA by *inter alia*: (1) subjecting her to a hostile work environment; (2) removing her from her position as Assistant to the Superintendent; (3) placing her in a position that denoted a set-back in her

career; (4) taking away various roles that she previous held; (5) taking away job responsibilities in her new role as Assistant to the Superintendent – Teaching & Learning and interfering with her ability to perform in said role; (6) completely marginalizing and/or changing the role of Assistant to the Superintendent – Teaching & Learning from how it was presented to her in June of 2021; and (7) constructively terminating her employment.

172.    Plaintiff's requests for FMLA were motivating or determinative factors in Defendant's aforesaid adverse employment decisions involving Plaintiff's employment.

173.    Plaintiff's complaints of FMLA retaliation were motivating or determinative factors in Defendant's aforesaid adverse employment decisions involving Plaintiff's employment.

174.    Defendant considered Plaintiff's FMLA needs in making the aforesaid adverse employment decisions involving Plaintiff's employment.

175.    Defendant took the aforesaid adverse employment actions in order to intimidate Plaintiff or dissuade Plaintiff from further exercising her rights under the and/or from making further complaints under the FMLA.

176.    These actions as aforesaid constitute both interference and retaliation violations of the FMLA.

        **WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.      Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority.

Plaintiff should be accorded those benefits illegally withheld from the date she first suffered retaliation, interference or discrimination at the hands of Defendant until the date of verdict;

B.      Plaintiff is to be awarded liquidated damages, as permitted by applicable law, in an amount determined by the Court or trier of fact to be appropriate to punish Defendant for willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C.      Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate, including but not limited to, emotional distress and/or pain and suffering damages (where legally permitted);

D.      Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

E.      Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to the Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

F.      Plaintiff's claims are to receive trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:      _____
        Ari R. Karpf, Esq.
        3331 Street Road
        Two Greenwood Square, Suite 128
        Bensalem, PA 19020
        (215) 639-0801

Dated: April 11, 2023

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

CIVIL ACTION

Kathleen Leon

v.

NO.

Bensalem Township School District

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.   ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.   ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.   ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)   ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.   (X)

| 4/11/2023 | | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 639-0801 | (215) 639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: __801 Cliff Road, Bensalem, PA 19020__

Address of Defendant: __3000 Donallen Drive, Bensalem, PA 19020__

Place of Accident, Incident or Transaction: __Defendant's place of business__

---

**RELATED CASE, IF ANY:**

Case Number: _____     Judge: _____     Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __4/11/2023__     _____     __ARK2484 / 91538__
                        *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

*A.* **Federal Question Cases:**

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☒ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

*B.* **Diversity Jurisdiction Cases:**

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Ari R. Karpf__ , counsel of record *or* pro se plaintiff, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, § 3(c ) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: __4/11/2023__     _____     __ARK2484 / 91538__
                        *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| LEON, KATHLEEN | BENSALEM TOWNSHIP SCHOOL DISTRICT |

**(b)** County of Residence of First Listed Plaintiff   Bucks
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Bucks
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Karpf, Karpf & Cerutti, P.C.; 3331 Street Road, Two Greenwood Square, Suite 128, Bensalem, PA 19020; (215) 639-0801; akarpf@karpf-law.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

1   U.S. Government Plaintiff

**X** 3   Federal Question
     *(U.S. Government Not a Party)*

2   U.S. Government Defendant

4   Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury - Product Liability | 690 Other | 423 Withdrawal 28 USC 157 | 376 Qui Tam (31 USC 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ | | | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability | Product Liability | | 820 Copyrights | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | 368 Asbestos Personal Injury Product | | 830 Patent | 450 Commerce |
| 152 Recovery of Defaulted Student Loans | 345 Marine Product Liability | Liability | | 835 Patent - Abbreviated New Drug Application | 460 Deportation |
| (Excludes Veterans) | | **PERSONAL PROPERTY** | | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle | 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | 480 Consumer Credit |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 710 Fair Labor Standards Act | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 190 Other Contract | 360 Other Personal Injury | 380 Other Personal Property Damage | 720 Labor/Management Relations | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | 362 Personal Injury - Medical Malpractice | 385 Property Damage Product Liability | 740 Railway Labor Act | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 196 Franchise | | | 751 Family and Medical Leave Act | 864 SSID Title XVI | 891 Agricultural Acts |
| | | | | 865 RSI (405(g)) | 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 790 Other Labor Litigation | | 895 Freedom of Information Act |
| 210 Land Condemnation | 440 Other Civil Rights | **Habeas Corpus:** | 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | 896 Arbitration |
| 220 Foreclosure | 441 Voting | 463 Alien Detainee | | 870 Taxes (U.S. Plaintiff or Defendant) | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 230 Rent Lease & Ejectment | **X** 442 Employment | 510 Motions to Vacate Sentence | | 871 IRS—Third Party 26 USC 7609 | 950 Constitutionality of State Statutes |
| 240 Torts to Land | 443 Housing/ Accommodations | 530 General | | | |
| 245 Tort Product Liability | 445 Amer. w/Disabilities - Employment | 535 Death Penalty | **IMMIGRATION** | | |
| 290 All Other Real Property | 446 Amer. w/Disabilities - Other | **Other:** | 462 Naturalization Application | | |
| | 448 Education | 540 Mandamus & Other | 465 Other Immigration Actions | | |
| | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

**X** 1 Original Proceeding    2 Removed from State Court    3 Remanded from Appellate Court    4 Reinstated or Reopened    5 Transferred from Another District *(specify)*    6 Multidistrict Litigation - Transfer    8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII (42USC2000); ADA (42USC12101); FMLA (29USC2601)
Brief description of cause:
Violations of Title VII, ADA, FMLA and the PHRA.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   **X** Yes   No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE   4/11/2023     SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

| Print | Save As... | Reset |